Filed 12/18/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RODERICK BARNES III,<br><br>    Defendant and Appellant. | D084512<br><br>(Super. Ct. No. FVI17001503) |

APPEAL from a judgment of the Superior Court of San Bernardino County, John Peter Vander Feer, Judge.  Reversed; remanded with directions.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting, and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Roderick Barnes III of three counts of attempted murder (Pen. Code, §§ 664, 187, subd. (a); counts 1–3), three counts of attempted robbery (Pen. Code, §§ 664, 211; counts 4–6), and three counts of assault with a firearm (Pen. Code, § 245, subd. (b); counts 7–9).  Regarding

the attempted murder and assault offenses, the jury also found true that Barnes personally discharged a firearm causing great bodily injury within the meaning of Penal Code section 12022.53, subdivision (d), personally discharged a firearm within the meaning of Penal Code section 12022.53, subdivision (c), and personally used a firearm within the meaning of Penal Code section 12022.53, subdivision (b). Concerning the assault offenses, the jury found true that Barnes personally inflicted great bodily injury on the victim within the meaning of Penal Code section 12022.7, subdivision (a).)

During phase 2 of the trial, the jury found Barnes guilty of participating in a criminal street gang in violation of Penal Code section 186.22, subdivision (a) as well as concluding that Barnes committed counts 4 through 9 for the benefit of, at the direction of, or in association with a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(C)).[1]

Finally, in phase 3 of the trial, the jury found true certain factors in aggravation relevant to Barnes's eventual sentence.

The court sentenced Barnes to prison for 70 years to life.

Barnes appeals, arguing the trial court prejudicially erred in overruling his objection, under Code of Civil Procedure[2] section 231.7, to the prosecutor's use of a peremptory challenge against a prospective juror. In addition, Barnes asserts the trial court erred by failing to provide the jury

---

[1] The court ordered the trial to be tried in three phases. In phase 1, the jury was to determine Barnes's guilt under counts 1 through 9 as well as the corresponding enhancements that were not gang related. During phase 2, the jury would consider Barnes's guilt under count 10 and the gang enhancements. For phase 3, the jury would determine if the prosecution proved the alleged factors in aggravation for sentencing purposes.

[2] Statutory references are to the Code of Civil Procedure unless otherwise specified.

with CALCRIM No. 332 and that insufficient evidence supported the jury's verdict for participation in a criminal street gang as well as the gang enhancements.

The People concede that Barnes's latter two arguments have merit but insist that the gang participation offense and gang enhancements can be remanded for retrial because Barnes's argument is based on the trial court's evidentiary error. We agree with the People that these two contentions are well taken; however, we disagree that retrial is appropriate. Where, as here, we reverse a conviction or true finding because of insufficient evidence, double jeopardy principles prohibit retrial.

In addition, we conclude that the trial court erred in overruling Barnes's objection under section 231.7. In doing so, the court considered its own reasons for striking the juror and explicitly found the prosecutor's stated reasons did not support the peremptory challenge. Accordingly, we reverse the judgment in its entirety. However, on remand, the prosecution can elect to retry Barnes for counts 1 through 9.

DISCUSSION[3]

I.

SECTION 231.7

A. Barnes's Contentions

Barnes argues that the trial court prejudicially erred in denying his motion under section 231.7 challenging the prosecutor's use of a peremptory

---

[3] Because the underlying facts of counts 1 through 9 are not important to the resolution of the issues before us, we eschew the traditional statement of facts in this opinion. Instead, we shall discuss the salient facts where needed while addressing the issues Barnes raises.

challenge to strike a Black prospective juror. We agree with Barnes's contention.

## B. Background

Barnes is a Black male. Prospective Juror No. 15 (PJ No. 15) is a Black female. She was called to the jury box in the first group of 18 prospective jurors. PJ No. 15 was the sole Black juror in the jury box at that time. The court questioned each of the first 18 prospective jurors in turn. Regarding PJ No. 15, the exchange was as follows:

"Q (BY THE COURT:) Number 15, good afternoon.

"A Good afternoon, sir.

"Q And – oh, so you['re] a supervisor for Walt Disney?

"A Yes.

"Q And what do you supervise?

"A A guest information and ticket sales team. There are 298 people underneath me.

"Q Okay. And where is your main office?

"A My home.

"Q Oh, you work from home. Did that change in the last few years?

"A Due to COVID, sir.

"Q You used to drive to Orange County?

"A Yes, sir.

"Q How long have you worked for them?

"A Six months.

"Q How long?

4

"A  Six months, and then 3 years prior to 2019.

"Q  Okay.  And so you had a gap in time?

"A  Yes, sir.

"Q  And what did you do during that gap?

"A  I helped open the Galaxy Adventure.  I was a merchandise engineer.

"Q  Okay.  You've answered everything else.  Thank you.

"A  Thank you."

The following day, the prosecutor questioned the jurors.  After asking questions of prospective juror numbers 8 and 16, the prosecutor presented a hypothetical and questioned PJ No. 15 as follows:

"[Prosecutor]:  Now, another important duty of a juror is to follow the law that the judge gives to you.  Sometimes jurors will come in and they'll tell me, Sean, you know, I want to serve, but there's this law that I don't believe in, and I just can't follow this law.  And I very much appreciate them letting me know at the very beginning.  So if that is you today with any of the laws we talk about, please let me know.

"I would like to explore this via hypothetical.  So imagine you're all jurors on a speeding case.  Imagine there is a hypothetical defendant who is charged with speeding.  Let's say he was driving five miles over the speed limit, and the officer gets up on the stand and proves to you all beyond a reasonable doubt, for the sake of this hypothetical, that this hypothetical defendant was driving 5 miles over the speed limit.  Okay?  And the judge's law is if you find that the defendant was driving any speed over the limit, you must return a verdict of guilty.

"Ma'am, Number 15, would you help me out with this one?  What do you think would your verdict be in this case?

5

"JUROR NO. 15:  You stated that the judge said that anything over the speed limit has to return a verdict of guilty?

"[Prosecutor]:  Yes, ma'am.

"JUROR NO. 15:  The judge technically does not decide the law.  So in regards to if that was what we were being told that we have to follow, then, yes, but if there was a notated law then, no.  We would not return.

"[Prosecutor]:  You said the judge does not decide the law.

"JUROR NO. 15:  Meaning that he created the law for us to then apply.

"[Prosecutor]:  No.  No.  He's not the legislator.  He just gives you the law, the law of California.

"JUROR NO. 15:  Then, yes, if he gave us the law to follow, and there was without shadow of a doubt that that person is going over the mile per hour speed limit, then, yes we would return a verdict of guilty.

"[Prosecutor]:  What about if it was only three miles over the speed limit?

"JUROR NO. 15:  You said anything above the stated speed limit, so if even if 5 that technically still breaks the law.

"[Prosecutor]:  Okay.  So safe to say even one mile, you would bring a verdict of guilty?

"JUROR NO. 15:  (Nodded her head.)

"[Prosecutor]:  Thank you, ma'am."

Later, the prosecutor brought up the television shows *CSI* and *Law & Order* and asked the potential jurors whether they understood that the time frame depicted in those shows was unrealistic.  Regarding *CSI*, the prosecutor noted that the show features "special gadgets" as well as DNA and fingerprint evidence for every case.  He asked the potential jurors, "[D]o you

6

feel like you'll need that DNA, the fingerprints, everything, do you think that's necessary for a trial in order to return a verdict of guilty?"  PJ No. 15 responded, "Yes."

A few other jurors offered their thoughts on the matter, without expressly agreeing with PJ No. 15.  For example, Prospective Juror No. 19 qualified by saying, "Not if there is other proof."

The prosecutor returned to PJ No. 15, asking, "Do you feel like you absolutely need DNA fingerprints to find guilt beyond a reasonable doubt?"  PJ No. 15 qualified her earlier "yes" response and said that "[i]f there are other factors then no, you wouldn't just need DNA or evidence.  If there are other factors, there are other ways to prove burden of proof."  She noted that "fingerprints and DNA can sometimes not reflect the entire truth."

The prosecutor asked the other panelists about that issue and then returned to PJ No. 15:

> "[Prosecutor]:  Juror Number 15, you said you work as a supervisor for Walt Disney; is that right, ma'am?
>
> "JUROR NO. 15:  Yes, sir.
>
> "[Prosecutor]:  That sounds like a really cool job.
>
> "JUROR NO. 15:  It is.
>
> "[Prosecutor]:  I was a little bit jealous.  Can you tell me what you do in that position?
>
> "JUROR NO. 15:  Well, I do have—I do manage a team underneath me.  We assist with information regarding upcoming trips to the Disneyland Resort, regarding special events, and Magic Kingdom.

"[Prosecutor]: You're coordinating all that? You said you have 278 people working underneath you?

"JUROR NO. 15: Yes, sir.

"[Prosecutor]: All right. Thank you, ma'am."

When the parties finished questioning the potential jurors, the court asked whether there were any challenges for cause. After hearing such challenges, the parties were invited to make peremptory challenges. Among other peremptory challenges, the prosecutor excused PJ No. 15. Defense counsel then asked to be heard under section 231.7.[4]

After the potential jurors were excused, the court then clarified that defense counsel was objecting, under section 231.7, to the prosecutor's use of a peremptory challenge on PJ No. 15. Counsel confirmed:

"I believe that the use of a peremptory challenge on this particular Juror Number 15 was solely based on her race, her race similar to that of Mr. Barnes, and dissimilar to any potential or prospective witness in this case.

"And I don't think there is any clear and convincing evidence that an objectively reasonable person could view this juror's responses to voir dire as a basis for peremptory challenge. And I don't think any of her—there is no clear and convincing evidence that an objectively reasonable person would review the rationale or any perceived rationale as unrelated to the prospective juror's race."

The court then noted that PJ No. 15 "appeared . . . to be perceived as a black female, or African American female. The defendant in this case is black, or African American male." Further, the court said that it was not aware of the racial identification of any of the alleged victims or any other

_____

4     Defense counsel misspoke and referred to section 231.5. That said, it is clear from the record and the subsequent argument before the trial court that everyone understood section 231.7 was the correct statute.

8

witnesses.  The court then asked the prosecutor to "state the reason for the peremptory challenge and why it's been exercised."

The prosecutor replied:

> "The reason for the peremptory challenge, 100 percent has nothing to do with race.  As the Court heard, Juror Number 15 said that she has many people working underneath her, and she repeated that again with me, that there are people working underneath her.  Her response to questions were terse."

In response to the court's question about the prosecutor's use of the word "terse," the prosecutor explained:

> "Terse, t-e-r-s-e.  Were short.  They were—for example, I asked if she could follow the law if the judge said that any speed limit over—any speed over the limit must find guilty.  And instead of typical response, her response was that you do not decide the law.  I had to clarify that with her.  But just one of many examples how her responses were terse.  She would not work well with other jurors when she sees people she supervises as underneath her.

> "I will note for the record that prior to that peremptory challenge on Juror 15, the People exercised three other peremptory challenges.  Prior to this new jury selection law, my practice would not be to put any perceived race or gender, because I felt it was irrelevant."

After some additional explanations by the prosecutor that he did not consider race in striking PJ No. 15, the court reiterated the prosecutor's reasons for striking that potential juror:

> "So your reasons are, she said that many people work underneath her.  She was terse in her responses.  She made a statement that I don't create the law, that was clarified that the legislature decides the law.  Based on that she would—her comment about supervising people underneath her she would not work well with other jurors.  And you exercised peremptory jurors from other racial groups before striking or exercising peremptory challenge as to Juror

9

Number 15, who was the only in—looking in the box, jury box, would be the only African American or Black on the jury box. Correct?"

The prosecutor agreed with the court's summary, emphasizing that if PJ No. 15 was eager to tell him that he was incorrect, she would do the same thing in the jury deliberation room.

After the prosecutor laid out his reasons for striking PJ No. 15, defense counsel argued that the stated reasons did not justify a nondiscriminatory reason for striking her, noting that the prosecutor's explanation implicated subdivisions (g)(1)(B) and (C) of section 231.7. In response, the prosecutor asserted that his problem with PJ No. 15 was not her "lack of rapport or demeanor or the response[,]" but "her attitude that she sees people who work for her as underneath her. She's repeated it twice."

After the parties submitted, the court observed:

"It's going to take me a little while. I have to go through the questions.

"Part of the issue here is under 231.7, the (g)(1):

'The following reasons for peremptory challenges have historically been associated with improper discrimination in jury selection (b), the juror exhibited either a lack of rapport, or problematic attitude, body language, or demeanor.'

"So that would go along with terse responses, questions about deciding the law, supervising people underneath her. So those would fit under that category. Lack of rapport, problematic attitude, body language, or demeanor.

"The answers were not unintelligent or confused. I don't see inattentiveness or failing to make eye contact. So those aren't at issue. It is the subsection (b) that the Court has to look at and see if there is corroboration for that."

10

The court's comments led to further discussion between the parties regarding whether PJ No. 15 would work well with other jurors or if the prosecutor was merely complaining about her attitude or rapport. Ultimately, the court took the matter under submission.

The next day, the court began by providing a tentative ruling on Barnes's objection under section 231.7:

> "So one of the things—so I will say first that I did—was not surprised or I actually anticipated a peremptory challenge by the People, but not for the reason stated by [the prosecutor]. One of the things I researched, it's not so much my notes, although I did verify certain things in LiveNote. One of the statutes I wanted to refer to was the Court's ability to look beyond the actual reasons stated by the prosecutor in this case. And CCP section 231.7[,subdivision] (d)(1) states:
>
>> 'The Court shall consider only the reasons actually given, and shall not speculate on, or assume the existence of other possible justifications for the use of the peremptory challenge.'
>
> "So the—so the reasons there were actually given by [the prosecutor] were—was that Juror Number 15 said many people working were underneath her in her supervisory role. He found 'underneath her' to be some sort of derogatory term, and her answers or responses were terse, and then we have this little colloquy about deciding the law where she misunderstood and clarified later with [the prosecutor].
>
> "So in looking at the definition of terse, terse just means brief, or using very few words. So excusing a juror for being brief or using very few words doesn't seem to be a—you know, it wasn't rude, so I don't think that necessarily means she was unfriendly or rude. It means brief and to the point, usually. I don't—I don't so I don't see how that is grounds for excusal. Many people gave short answers and short responses. I don't recall anybody who is a supervisor of that many individuals.

11

"So we have that being the actual response by . . . our prosecutor. So I have to look at those that actual response, and then decide is there a substantial likelihood that an objectionably reasonable person would be unaware of unconscious bias or actual bias. And then one of the provisions state further in the CCP, saying that:

> 'Historically, making justifying excusals for jurors, these have been found to be historically been associated with improper discrimination, and that the prosecutor—prospective jury either exhibited lack of rapport, or problematic attitude, body language, or demeanor.'

"And that's kind of where we are based on what was said that:

> 'There wasn't a rapport, a close and harmonic relationship in which the people or groups concerned understand each other feelings or ideas and communicate well.'

"A problematic attitude, body language wasn't—that wasn't being presented, although I did note that she wore a mask, and that may have limited communications. And then demeanor refers to outward behavior or bearing. So that was the reasons proffered, but they weren't the reasons I expected the People to offer, because the reason I thought or expected a peremptory challenge to be exercised is because this juror, when given that hypothetical about driving and the speed limit, and that was questioned that she didn't understand. She apparently thought, she believed the judge—she was being told by the judge to return a verdict of guilty, but that was clarified. But she did say that she would follow the law, and if it was proven, if the proof was without a shadow of a doubt. So she didn't refer to beyond a reasonable doubt. She referred it has to be proven to her without a shadow of a doubt, and so that was her belief that it would have to be proven beyond a shadow of a doubt.

"Additionally, when she was—and I wrote this on my notes yesterday, [the prosecutor] asked a question of the entire group, the entire 18 about kind of CSI-type evidence, referred to CSI and that type of language, and saying, well, what would you need for—let me try and find it in my notes here.

"(There was a pause in the proceedings.)

"Let me be more precise with the question. Ah, there it is. Going through CSI and those types of language, and would you—would you need fingerprint or DNA evidence to convict? And she was the only person out of 18 to answer yes, she would need DNA or fingerprint evidence to convict. That is related to this case, because there is no DNA evidence or fingerprint evidence. So she answered yes she would need that. And then later on she clarified that, Well, maybe certain factors. Then it seemed like she had suspicion of DNA evidence and—and fingerprint evidence.

"So that separates her from other jurors, not based on race, but appears from my perspective that she had a higher standard of proof that she was going to hold the People to, based on need to be proof beyond a shadow doubt. Nobody ever challenged her on that, but that was her comment about the burden of proof she would need would be beyond a shadow of a doubt, she would need fingerprint or DNA evidence before she could render a verdict of guilty. She was the only individual who answered that question with a yes. And she also, under clarification, well, later on when she was talking about those factors, it appeared she had suspicions in addition to whether DNA or fingerprint evidence would be adequate.

"So, in the court's view, that's what I would—thought would be the basis for the People's reasoning for the peremptory challenge, but it was not stated. Well, the code section says, I can't look. I can't assume, or—well, it says:

> 'The Court shall only consider the reasons actually given and shall not speculate on or assume the

13

existence of other possible—existence of other peremptory challenges.'

"So that's the language the Court is grappling with. Can I use that in my analysis? Because even though [the prosecutor] did not present that, it was stated on the record. So that's where the Court's at. That's why I took a recess.

"I tried to find published cases on that issue. I could not find any published cases. So I'm giving a tentative decision, because the reasons given really aren't, kind of don't really reach that, you know. They're not—in the Court's view, they seem to fall within CCP 231.7, and would seem to require the Court to sustain the objection, but likewise the answers given by Juror Number 15 that were not given as a reasons, would justify the Court overruling it. But—so that's—that's where the Court's at."

The court then asked the prosecutor to address the tentative ruling. The prosecutor admitted that he simply "missed" PJ No. 15's "shadow of a doubt" comment. Nonetheless, he argued that in his comment that PJ No. 15's answers were "terse" he was referring to "the entire communication," specifically PJ No. 15's statements about *CSI* and DNA evidence. Yet, the court was not persuaded: "That's the problem, you've not brought up. You've got to create the record. You have to create the record. Not the Court. So go ahead."

Again, the prosecutor referred to his characterization of PJ No. 15's answers as terse: "I figured her answers kind of reflected that herself. And when I used the word terse it was in that broader sense of her entire answers to the Court." The prosecutor also emphasized that PJ No. 15's answers indicated that she saw "people beneath her" and that her character was concerning because she had "some sort of personality that she's not going to deliberate. She's going to nitpick everything. She's going not gel well with

14

the jurors." The prosecutor ended by contending, "A superiority complex is not race based. And that is a proper peremptory challenge."

Defense counsel then noted that the reasons offered for striking PJ No. 15 did not satisfy the requirements of section 231.7.

After some additional back and forth from the parties, the court overruled defense counsel's objection under section 231.7: "So an objectively reasonable person was able to listen to her answers, I don't believe would find unconscious or implicit bias." In doing so, the court explicitly relied on PJ No. 15's "shadow of a doubt" comment as well as her response to the *CSI* and DNA evidence hypothetical. The court summarized its ruling as follows:

> "So it appears to the Court that this juror in particular has a higher burden of proof. She said that beyond a shadow of a doubt. And—but I don't—but I do need to make the record clear. I don't—didn't find her to have a superiority complex, if that's what's being argued, that somehow she was superior to everyone else. That was not—I did not take her words as being she has people serving. She referred to those, her people as her team underneath her, as being some sort of superiority complex over others. That these people are somehow less human or less worthy because she supervised them. I did not take that.
>
> "Her terse demeanor was—she did—was brief and very business like, so I don't really find that to be the basis. But I do believe that her answers regarding burden of proof and having a higher burden being placed on the People, do show a non-racial basis for the use of a peremptory challenge that would not be suspect to an objectively reasonable person of unconscious bias or purposeful discrimination."

After the jury returned a verdict on the aggravating factors, the trial court revisited its ruling on Barnes's section 231.7 objection to the striking of PJ No. 15. In doing so, the court noted that Alternate Juror Nos. 3 and 4 were "[B]lack female adult jurors." The court then emphasized that it did not

15

believe the prosecutor was "feigning" his concern about PJ No. 15's statement that people worked underneath her. The court observed that the prosecutor "seemed generally upset" and hypothesized that the prosecutor, being of Korean ethnicity, might have had a different perspective than the court in hearing PJ No. 15's words. The court then reaffirmed its previous ruling to Barnes's objection under section 231.7.

## C. Applicable Law

Section 231.7 prohibits the use of "a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." (§ 231.7, subd. (a).) If a party or the trial court objects to the use of a peremptory challenge, "the party exercising the peremptory challenge shall state the reasons the peremptory challenge has been exercised." (*Id.*, subd. (c).) The trial court then "evaluate[s] the reasons given to justify the peremptory challenge in light of the totality of the circumstances. The court shall consider only the reasons actually given and shall not speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge." (*Id.*, subd. (d)(1).) Section 231.7 "contains two separate provisions (subds. (e) and (g)) describing presumptively invalid reasons for the exercise of a peremptory challenge. Each subdivision sets out a distinct process by which a court determines whether a presumptively invalid reason can be absolved of that presumption. (*Id.*, subds. (e), (f), (g)(2).)" (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 793.) As relevant to this case, presumptively invalid reasons include: "The prospective juror exhibited either a lack of rapport or problematic attitude, body language, or demeanor." (§ 231.7, subd. (g)(1)(B).)

16

Finally, under section 231.7, subdivision (d), reasons that are not presumptively invalid are evaluated "in light of the totality of the circumstances" to determine if "there is a substantial likelihood that an objectively reasonable person[,]" who is aware that unconscious bias and purposeful discrimination have resulted in the unfair exclusion of potential jurors in California, would view membership or perceived membership in any of the protected groups as a factor in the use of the peremptory challenge. (§ 231.7, subd. (d)(1), (2)(A).)

On appeal, the overruling of an objection under section 231.7 is reviewed de novo "with the trial court's express factual findings reviewed for substantial evidence." (§ 231.7, subd. (j).) The appellate court is to consider only those reasons actually given by the trial court and may "not speculate as to or consider reasons that were not given to explain either the party's use of the peremptory challenge or the party's failure to challenge similarly situated jurors who are not members of the same cognizable group as the challenged juror, regardless of whether the moving party made a comparative analysis argument in the trial court." (*Ibid*.) If the appellate court concludes the trial court erred by overruling an objection, "that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (*Ibid*.)

### D. Analysis

Here, Barnes's primary argument is the trial court violated section 231.7, subdivision (d)(1) when it overruled his objection to the peremptory challenge of PJ No. 15 because the court did not only consider

17

"the reasons actually given" but instead, speculated about what other reasons the prosecutor could have relied on to strike the juror.  We agree.

After Barnes's trial counsel objected to the prosecutor's peremptory challenge of PJ No. 15, the court allowed the prosecutor to state all his reasons for striking the juror.  At the conclusion of the prosecutor's argument, the court summarized the prosecutor's reasons as follows:  "[S]he said that many people work underneath her.  She was terse in her responses.  She made a statement that I don't create the law, that was clarified that the legislature decides the law.  Based on . . . her comment about supervising people underneath her she would not work well with jurors."  The prosecutor agreed:  "That's right.  And if she is eager to tell me I'm incorrect, she's going to be here to say that in the jury deliberation room."

After the court took the matter under submission, he expressed surprise to the parties the following day based on the prosecutor's stated reasons for striking PJ No. 15, noting "they weren't the reasons . . . I thought or expected a peremptory challenge to be exercised" against that potential juror.  The court then questioned whether he could consider a basis not stated by the prosecutor to overrule Barnes's objection.  And the reason the court asked the question was clear.  The court viewed the prosecutor's stated reasons "to fall within [section] 231.7[ ] and would seem to require the court to sustain the objection."  In other words, if the court only considered the prosecutor's articulated explanation, the court believed that Barnes's objection was well taken.  However, if the court considered "the answers given by Juror Number 15 that were not given as a reason," "the Court [would be justified] in overruling it."

The court clearly took the latter approach.  It explicitly rejected the prosecutor's stated reasons as justifying a peremptory challenge of PJ No. 15

18

and overruled the objection based on reasons the prosecutor never raised. In doing so, the court clearly erred. (See § 231.7, subd. (d)(1).)

The People dedicate a single paragraph of their 100-page brief to Barnes's primary argument. To this end, they agree that the court erred "under the statute" "to the extent the trial court considered the juror's isolated comment about holding the People to a higher 'beyond a shadow of a doubt' standard of proof." Nonetheless, the People claim, "in looking at the totality of the circumstances as required under section 231.7, subdivision (d)(1)," the court could appropriately consider PJ No. 15's "shadow of a doubt" comment "as part of the larger conversation that exemplified that juror's impulse to challenge the prosecutor on the law instead of directly answering questions." We disagree.

Below, the prosecutor raised two issues with PJ No. 15. First, he was bothered by her use of the term "underneath" in describing the individuals she managed: "There are 298 people underneath me." "I do manage a team underneath me." Second, "her response to questions was terse." Based on these two concerns, the prosecutor argued that PJ No. 15 "would not work well with other jurors." Moreover, the prosecutor clearly was troubled by PJ No. 15's willingness to challenge him: "And if she is eager to tell me that I'm incorrect, she's going to be here to say that in the jury deliberation room." And the prosecutor represented to the trial court that he did not strike PJ No. 15 because of "lack of rapport or demeanor, *or the responses. It's her attitude that she sees people who work for her as underneath her*." (Italics added.) Later, the prosecutor again emphasized he saw a problem with PJ No. 15's "character, this person's personality that that shows that this person will not get along with other jurors." Indeed, the prosecutor concluded

19

his argument on Barnes's section 231.7 objection by focusing on PJ No. 15's attitude: "A superiority complex is not race based."

Further, the court appeared at least ostensibly concerned that the prosecutor's stated justifications implicated the presumptively invalid reasons to strike a juror set forth in section 231.7, subdivision (g)(1)(B): "The prospective juror exhibited either a lack of rapport or problematic attitude, body language, or demeanor." To wit, the court commented, "So that would go along with terse responses, questions about deciding the law, supervising people underneath her. So those would fit that category. Lack of rapport, problematic attitude, body language, or demeanor. [¶] . . . It is the subsection (B) that the Court has to look at and see if there is corroboration for that." In fact, the court repeated this same concern when providing its tentative ruling, "So I'm giving a tentative decision, because the reasons given really aren't, kind of don't really reach that, you know. They're not—in the Court's view, they seem to fall within [section] 231.7, and would seem to require the Court to sustain the objection[.]"

Despite the trial court's stated concerns, now on appeal, the People argue that both the reasons stated by the prosecutor below "indicated that [PJ No. 15] would not follow the law" and that the prosecutor showed concern with "the substance of the prospective juror's answer, as opposed to the prospective juror's general attitude or demeanor." Such an argument is not supported by the record whatsoever. Indeed, the People do not cite to anywhere in the record where the prosecutor argued that PJ No. 15 would not follow the law. Nor could they. The prosecutor never made any such statement. Moreover, the court stated that PJ No. 15 did not understand one of the prosecutor's questions and that she believed she was being told by the judge to return a verdict of guilty. But after she understood the question, the

20

court noted that "she did say that she would follow the law, if it was proven, if the proof was without a shadow of a doubt." True, the court was troubled by the potential juror's "shadow of a doubt" comment, but the prosecutor explicitly acknowledged he was not challenging her on that comment, and the People concede as much here as well.

Additionally, we are not persuaded by the People's assertion that the prosecutor was concerned about the substance of PJ No. 15's responses. The prosecutor claimed that the potential juror was "terse" in her responses. Terse means "using few words:  devoid of superfluity."[5] The trial court defined it as "brief, or using very few words." It is not a word indicating a problem with the substance of a response but the means by which the response was given. In describing terse, the prosecutor defined it as "short." Subsequently, in elaborating about his use of the word "terse," the prosecutor explained:  "So when I said her responses were terse, that seems to be the entire communication. That it seems to have this attitude, not disparaging this juror, but had this attitude of kind of knowing everything, and if she's willing to challenge the District Attorney, and correct me on what didn't need correcting, how much more is she going to do that with jurors who are warehouse workers, FedEx delivery drivers, Home Depot workers? Especially someone who has the attitude, who says that people are underneath her." Clearly, the prosecutor was focusing on PJ No. 15's attitude. He was not challenging the substance of what she said. Rather, he was troubled by her attitude:  "So when I said terse, and I apologize if I'm not using the correct semantics, I mean abrupt, has this 'I know everything'

---

[5]     (Merriam-Webster Dict. Online (2024) <https://merriam-webster.com/dictionary/terse> [as of December 18, 2024], archived at <https://perma.cc/MT8L-47QB >]).

attitude."  The prosecutor obviously was bothered that this prospective juror had the audacity to question him.  Indeed, he emphasized this trepidation at least twice during his argument on Barnes's section 231.7 objection.

Thus, the record makes clear that the prosecutor's concern with the terseness of PJ No. 15 involved the way she responded to questions, not the substance of her answers.  Put differently, the record clearly indicates that the prosecutor was primarily, if not entirely, concerned with PJ No. 15's attitude.

Similarly, we struggle to categorize the prosecutor's complaint about PJ No. 15's use of the word "underneath" as relating to the substance of her answers.  The prosecutor plainly was offended by her use of that word, and based upon her use of the word "underneath" twice during voir dire, argued that it proved she had a superiority complex.  Again, it appears that the prosecutor was disquieted by PJ No. 15's attitude.

Therefore, based on this record, we agree with the trial court's initial response to the prosecutor's stated reasons for challenging PJ No. 15—they fall under section 231.7, subdivision (g)(1)(B).  Consequently, the subject reasons are "presumptively invalid unless the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or the observations of counsel for the objecting party.  Even with that confirmation, counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried."  (See § 231.7, subd. (g)(2).)

Additionally, we have interpreted the pertinent language in section 231.7, subdivision (g) as follows:

> "This language indicates that the reasons identified in section 231.7, subdivision (g)(1) start out as presumptively invalid and that the only way to rebut the presumption of

22

invalidity is by applying the statutorily prescribed two-step
process of (1) confirmation of the behavior by the trial
court, and (2) explanation by counsel of why the behavior
matters to the case. If the presumption of invalidity for a
particular reason identified by counsel is not rebutted
through the two-step procedure set forth in
subdivision (g)(2) of section 231.7, that reason must be
treated as conclusively invalid. In other words, the trial
court must treat as conclusive the presumption that the
reason identified by counsel was actually based on "race,
ethnicity, gender, gender identity, sexual orientation,
national origin, or religious affiliation," or perceived
membership in any such group, as prohibited by
section 231.7, subdivision (a)." (*People v. Caporrotta* (2024)
103 Cal.App.5th 874, 890–891 (*Caporrotta*).)

Yet, in overruling Barnes's objection, the court did not utilize the
procedures outlined in section 231.7, subdivision (g)(2). Instead, the court
explicitly stated that it did not find PJ No. 15 to have a "superiority complex"
based on her comment that people worked "underneath her." Also, the court
specifically rejected the prosecutor's comments that the prospective juror was
"terse" as a valid basis to strike her. In fact, the court noted that other
prospective jurors responded in a similar manner: "Many people gave short
answers and short responses." Thus, the court did not confirm the behavior
identified by the prosecutor and plainly disregarded the prosecutor's stated
reasons for exercising a peremptory challenge on PJ No. 15 as being valid. At
that point, the court should have sustained Barnes's objection. (See
*Caporrotta, supra*, 103 Cal.App.5th at pp. 890–891.)

However, the court appears to have proceeded to perform a further
analysis, based on the totality of the circumstances approach described in
subdivision (d) of section 231.7. In doing so, the court did not rely on the
reasons the prosecutor stated but found, based on its review of the transcript
and its notes, that PJ No. 15 could be stricken on race neutral grounds

23

because she would hold the prosecutor to a higher burden of proof than beyond a reasonable doubt.

The trial court's approach was improper for two reasons. First, having determined that the prosecutor's reasons for striking the prospective juror triggered subdivision (g)(1)(B) of section 231.7, "the totality of the circumstances analysis in section 231.7, subdivision (d) plays no role in determining whether a presumption of invalidity arising under subdivision (g) has been rebutted." (*Caporrotta, supra*, 103 Cal.App.5th at p. 891.) Thus, as soon as the court could not confirm the behavior as identified by the prosecutor, it should have sustained the objection. (*Ibid.*) Second, even if it were appropriate to consider the totality of the circumstances as set forth in subdivision (d), the court was limited to considering "only the reasons actually given" by the prosecutor in striking PJ No. 15. (§ 231.7, subd. (d)(1).) The court is not permitted to "speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge." (*Ibid.*) Here, it seems as if the court did not believe it was speculating because it found the justification for striking the prospective juror in the record. But the statute's prohibition on speculation is not satisfied simply because a court can find a possible reason in the record. The speculation the subdivision forbids is conjecture regarding what the prosecutor might have relied on. In the instant action, the prosecutor explicitly stated that he did not consider PJ No. 15's "shadow of a doubt" comment as a basis to strike her. Nonetheless, that is the very reason on which the court relied to overrule Barnes's objection. This is precisely the type of speculation subdivision (d)(1) prohibits.

For all the reasons discussed above, we conclude the trial court erred in overruling Barnes's objection under section 231.7. As mandated by statute,

the judgment as to the first phase of the trial (concerning counts 1 through 9) is reversed, and the case will be remanded for a new trial. (See § 231.7, subd. (j).)

## II.

## THE GANG OFFENSE AND ENHANCEMENTS

### A. Barnes's Contentions

Barnes asserts the trial court prejudicially erred in failing to instruct the jury sua sponte under CALCRIM No. 332. In addition, he contends substantial evidence does not support the jury's finding that members of Lime Hood Piru (LHP) engaged in a pattern of criminal street activity as defined by Penal Code section 186.22, subdivision (f).[6] Specifically, Barnes insists the evidence offered was insufficient to prove that one of the predicate offenses offered by the prosecutor (the murder of P.M.) commonly benefited LHP.[7] The People concede the merit of both of Barnes's arguments but

---

[6] There was evidence presented at the second phase of the trial that Barnes was a member of LHP.

[7] Relying on *People v. Delgado* (2022) 74 Cal.App.5th 1067, Barnes also argued in his opening brief that the evidence offered during the gang offense and enhancement trial was insufficient to prove that members of LHP collectively engaged in a pattern of criminal street gang activity. However, after he submitted the opening brief, our high court overruled *Delgado* on that point. (See *People v. Clark* (2024) 15 Cal.5th 743, 764, fn. 8.) The people point out that *Clark* overruled *Delgado* in the respondent's brief, and Barnes did not address the issue on reply. Thus, we view this argument as abandoned. However, even if we were to address it, we would follow *Clark* (see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455) and conclude Barnes's argument lacks merit.

maintain that the court's instructional error is moot because the substantive gang offense and true findings on the enhancement must be reversed.

Although the parties agree about the errors the trial court committed, they disagree regarding whether we should remand this matter back to the trial court and allow the prosecutor to retry the gang related offense and enhancements. Because we conclude that substantial evidence does not support the jury's verdict and findings as to the offense and enhancements under Penal Code section 186.22, double jeopardy prohibits retrial on those issues.

### B. Relevant Law

Penal Code section 186.22 prohibits unlawful participation in a criminal street gang, as set forth in subdivision (a), and includes sentencing enhancement provisions, which are found in subdivision (b). The statute also has alternate penalty provisions, Penal Code section 186.22, subdivisions (b)(4), (5), and (d), the latter of which allows for punishment of up to three years in prison if the defendant is "convicted of a gang-related misdemeanor offense." (*People v. Briceno* (2004) 34 Cal.4th 451, 460, fn. 7.)

A criminal street gang is "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (Pen. Code, § 186.22, subd. (f).)

A " 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of" two or more offenses listed in Penal Code section 186.22, subdivision (e), if such conduct occurred within certain

26

timeframes and under particular circumstances specified therein. (*Id.*, subd. (e)(1).) This is commonly known as the "predicate offenses" requirement. (*People v. Navarro* (2021) 12 Cal.5th 285, 311.)

"The elements of the gang participation offense in [Penal Code] section 186.22[,] [subdivision] (a) are: First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.) The enhancements and alternate penalty provisions apply only to gang-related crimes, meaning offenses "committed for the benefit of, at the direction of, or in association with a criminal street gang." (Pen. Code, § 186.22, subds. (b), (d); accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) The enhancements and alternate penalties further require "the specific intent to promote, further, or assist in criminal conduct by gang members." (Pen. Code, § 186.22, subds. (b)(1), (4), (d).)

By enactment of Assembly Bill No. 333 (Assembly Bill 333), Penal Code section 186.22 has new requirements for establishing liability under subdivisions (a), (b), and (d). (Stats. 2021, ch. 699, § 3.) As of January 1, 2022, predicate offenses must be shown to have "commonly benefited" the alleged gang, and the common benefit must have been "more than reputational." (Pen Code, § 186.22, subd. (e)(1).) Currently charged offenses no longer qualify (*id.*, subd. (e)(2)), and at least one predicate offense must have been committed "within three years of the date the current offense is alleged to have been committed . . . ." (*id.*, subd. (e)(1)). Among other additional changes, the terms "benefit," "promote," "further," and "assist" are

now defined to mean providing "a common benefit to members of a gang where the common benefit is more than reputational." (*Id*., subd. (g).)

Assembly Bill 333 also added Penal Code section 1109. (Stats. 2021, ch. 699, § 5.) The new statute provides:

> "(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of [Penal Code] [s]ection 186.22 shall be tried in separate phases as follows:
>
> > "(1) The question of the defendant's guilt of the underlying offense shall be first determined.
> >
> > "(2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of [Penal Code] [s]ection 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence.
>
> "(b) If a defendant is charged with a violation of subdivision (a) of [Penal Code] [s]ection 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of [Penal Code] [s]ection 186.22." (Pen. Code, § 1109.)[8]

---

[8] The second phase of the trial relating to Barnes's participation in a criminal street gang as well as the alleged gang enhancements was tried separately from counts 1 through 9 pursuant to Penal Code section 1109.

## C. Background

Barnes's substantial evidence challenge to his conviction for participating in criminal street gang as well as the true findings on the gang enhancements is aimed at the prosecution's evidence of one of the required predicate acts. Specifically, Barnes maintains that substantial evidence does not support that the murder of P.M. "commonly benefitted" LHP. Regarding P.M.'s murder, the prosecution offered the testimony of Rialto Police Corporal David Padilla and Frank Harris, a deputy detective with the San Bernardino's Sheriff's Office.

On July 8, 2014, Padilla investigated the killing of P.M. Ultimately, Shazad Khan was arrested for, and later convicted of, murdering P.M. At the time of his arrest, Khan had a tattoo of the letters "LHP" on his forearm. He lived with his girlfriend. Padilla searched Khan's girlfriend's house and found a green notebook. The notebook contained rap lyrics and red colored drawings depicting Rosecrans Street in Los Angeles. The notebook also contained drawings of a red colored figure that looked like Khan. The figure had "LHP" tattooed on its forearm, and it appeared to be shooting at another blue colored figure.

The prosecution also tried to elicit testimony from Padilla regarding his interviews with a "witness victim" of the P.M. murder. Apparently, it was the prosecution's intent for Padilla to provide the "general circumstances" of the offense through the witness's statements to him. However, out of the presence of the jury at an Evidence Code section 402 hearing, the court ruled that Padilla could not testify regarding the witness's statements because it constituted case specific hearsay. The court also stated that the witness's statements did not qualify as spontaneous statements under Evidence Code section 1240. Essentially, the court ruled that unless Padilla personally

29

observed the event, he could not testify about the background evidence surrounding the predicate offense of P.M.'s murder. Accordingly, the prosecution did not offer any additional information about P.M.'s murder through Padilla.

Instead, the prosecution tried to offer additional information about the murder through Harris, the prosecutor's gang expert. The prosecutor asked Harris whether, "based on your background, training, and experience, the materials you reviewed as an expert, do you have an opinion as to whether the murder committed by Shazad Khan benefited—commonly benefited the gang?" Harris answered in the affirmative that it did, "[b]y taking down a rival."

Barnes's trial counsel objected that the response "[a]ssumes facts not in evidence. We didn't hear any evidence that the victim . . . was a member of any rival gang." The court responded that "he can testify to what's been presented as evidence in this case. He can rely on the police reports and things and give his opinion. But bringing in details from the police reports, that's sustained." The court thus admitted the first part of the detective's answer—that the crime benefited the gang—but sustained the objection as to the reason. It struck that portion of Harris's answer.

The prosecutor then asked, "[b]ased on your review of the reports, speakings [sic] with investigating officers, do you have an opinion as to what benefit Khan's murder had for the gang?" Harris answered, "The opinion is that the crime of murder was retaliation."

Defense counsel objected and asked the court to strike Harris's opinion because "we didn't hear any evidence from . . . Padilla that the crime was committed for retaliation. If he's relying on hearsay statements." The

30

prosecutor responded, "There's no case-specific information submitted to the jury."

The court overruled the objection: "It's opinion testimony. Overruled."

### D. Analysis

Barnes argues that substantial evidence did not establish that the predicate offense of murdering P.M. "commonly benefited" LHP. Specifically, he asserts that Harris's testimony that Khan murdered P.M. for retaliation could have only been based on Harris's review of the various police reports and what he was told from other members of law enforcement. Barnes further notes that Harris never told the jury what those reports or law enforcement personnel said.[9] Thus, Harris's opinion lacked sufficient foundation and could not constitute substantial evidence.

An expert witness may, on direct examination, provide the reasons for an opinion as well as the information upon which it is based, even if that information is inadmissible. (Evid. Code, §§ 801, subd. (b), 802.) Moreover, expert opinion can support a gang enhancement under Penal Code section 186.22, subdivision (b)(1). (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

In *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), the California Supreme Court held that case-specific statements by a gang expert concerning a defendant's gang membership constitute inadmissible hearsay under California law and testimonial hearsay under *Crawford v. Washington*

---

[9] Barnes also argues that Harris could not have testified at trial as to the substance of the police reports he reviewed or the conversations he had to form his opinion because such evidence would have been inadmissible hearsay.

(2004) 541 U.S. 36 (*Crawford*).[10]  (*Sanchez*, at p. 670.)  "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried."  (*Id*. at p. 676.)  Our high court explained that, "[i]f an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay.  Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception.  Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner."  (*Id*. at p. 684, fn. omitted.)

Therefore, the court considered "the degree to which the *Crawford* rule limits an expert witness from relating case-specific hearsay content in explaining the basis for his opinion."  (*Sanchez, supra*, 63 Cal.4th at p. 670.)  It also clarified "the proper application of Evidence Code sections 801 and 802, relating to the scope of expert testimony."  (*Ibid*.)  The *Sanchez* rule aimed to curb any risk that expert witnesses would be used as " 'conduits to transmit inadmissible hearsay that does not otherwise fall under a statutory exception as assertions of fact to the jury.' "  (*People v. Valencia* (2021) 11 Cal.5th 818, 836 (*Valencia*).)

" 'Since *Sanchez*, California appellate courts have held that expert testimony about "the general attributes of the . . . gang, such as the gang's

---

10    In *Crawford*, the United States Supreme Court held that the admission of testimonial hearsay violates the confrontation clause unless the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine the declarant.  (*Crawford, supra*, 541 U.S. at pp. 53–54, 59.)  However, the court further stated that the confrontation clause does not prohibit the admission of testimonial statements for purposes other than establishing the truth of the matter asserted.  (*Id*. at p. 59, fn. 9.)

culture, the importance placed on reputation and guns, . . . the gang's rivals and claimed turf, the use of monikers and identifying symbols, and the like, [are] permissible as expert background testimony." ' [Citation.] A gang expert may testify about the history and founding of a particular gang, even if the sources of the information are hearsay." (*People v. Garcia* (2020) 46 Cal.App.5th 123, 167 (*Garcia*).) However, "an expert may not relate case-specific testimonial hearsay, such as information contained in police reports authored by other officers. [Citations.] [¶] A gang expert who has personal knowledge of the facts and is subject to cross-examination at trial may testify to facts contained in documents that would otherwise be considered testimonial hearsay, such as field identification cards. [Citation.] Testimony by an officer about personal observations made by that officer, such as of an individual's tattoos, location, companions, or clothing, are not hearsay and thus do not run afoul of the confrontation clause." (*Ibid.*)

In the instant matter, the People attempted to offer evidence about Khan's murder of P.M. through Padilla's testimony. However, the court did not allow Padilla to testify about his conversations with an alleged witness to the murder and what that witness had said about P.M.'s murder. Padilla did not personally witness the murder or observe any interactions between Khan and P.M. Thus, Padilla did not offer any essential explanation of the circumstances of P.M.'s murder that could establish that it occurred for a common benefit of LHP. (See *Garcia, supra*, 46 Cal.App.5th at p. 167.)

Because Padilla could not offer evidence to establish that P.M. was murdered for the common benefit of LHP, the prosecutor attempted to have Harris testify as to that necessary fact. However, the trial court sustained defense counsel's objection to Harris's testimony that Khan's murder of P.M. benefited LHP because it involved "taking down a rival." The parties agree

that the ruling was proper because evidence of the details underlying the crime, namely, that Khan and P.M. were rivals was not admitted at trial. "Without independent admissible evidence of the particulars of the predicate offenses, the expert's hearsay testimony cannot be used to supply them.  In the absence of any additional foundation, the facts of an individual case are not the kind of general information on which experts can be said to agree." (*Valencia, supra*, 11 Cal.5th at p. 838.)

Although the court properly excluded the admission of case-specific testimonial hearsay through Padilla, it then erred by admitting Harris's testimony that "[t]he opinion is that the crime of murder was retaliation." As the People point out, this testimony can be viewed two ways:  Retaliation could be a factual matter that constitutes case-specific hearsay or retaliation is a matter of opinion or characterization that requires a factual foundation.

In viewing "retaliation" as a case-specific fact, its admission would be error under *Sanchez*.  The trial court had previously ruled that testimony by Padilla, based on what a witness had told him, that "[t]here was this fight earlier" and the murder was "a retaliation" constituted inadmissible hearsay. Thus, admitting Harris's testimony recounting that the crime was retaliation could be interpreted as error under *Sanchez* because Harris testified to case-specific hearsay—Padilla's description of the murder as retaliation—that was not independently proven by competent evidence.  (*Sanchez, supra*, 63 Cal.4th at p. 686.)

Although we agree that the admission of Harris's opinion that the murder of P.M. was committed for retaliation could have been *Sanchez* error, on the record before us, it appears that it was not.  Three times the prosecutor sought to have a witness testify as to case-specific hearsay describing the circumstances of P.M.'s murder.  Three times the court

34

sustained defense counsel's objections to that evidence. Thus, the record clearly shows the trial court understood the dictates of *Sanchez*. And the court only overruled defense counsel's objection regarding Harris's retaliation opinion after the prosecutor represented that Harris was not offering case-specific hearsay. Indeed, in overruling the objection, the court characterized Harris's testimony as "opinion testimony."

Describing Harris's "retaliation" testimony as expert opinion testimony, the court still erred in admitting it because it lacked foundation. Our colleagues in Division Three of this court have addressed the issue of what constitutes a sufficient foundation for an expert's opinion regarding the primary activities element of a criminal street gang, which is informative here. In *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*), the juvenile defendant was charged with vandalism based on gang-related tagging activities. (*Id.* at p. 609.) There, the gang expert testified to the primary activities of a particular gang. (*Id.* at pp. 611–612.) He stated that "he 'kn[e]w' that the gang had been involved in certain crimes. No specifics were elicited as to the circumstances of these crimes, or where, when, or how [the expert] had obtained the information." (*Ibid.*) The appellate court determined that the expert's testimony lacked adequate foundation. The court reasoned there was no way to establish the reliability of the expert's testimony "because information establishing reliability was never elicited from him at trial." (*Id.* at p. 612.)

Like the expert in *Alexander L.*, Harris did not provide a foundation for his testimony that Khan committed murder for the purpose of retaliation. Padilla's testimony also did not provide details to support the expert opinion. No other evidence presented to the jury established that LHP commonly benefited from P.M.'s murder; therefore, that offense could not serve as a

35

predicate offense establishing LHP as a criminal street gang. With only evidence of one predicate offense, insufficient evidence supported the jury's finding that LHP engaged in a pattern of criminal gang activity. (Pen. Code, § 186.22, subd. (e); cf. *People v. Jennings* (2010) 50 Cal.4th 616, 638 ["In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt"].)

Although the parties agree that Harris's testimony was insufficient to establish one of the necessary predicate offenses and the verdict and findings of the second trial must be reversed, they disagree about whether the prosecutor can retry Barnes for the gang offense and gang enhancements after remand. The People urge that reversal should not foreclose retrial on the gang offense and gang enhancements because Barnes's "claim is rooted in evidentiary error, which does not trigger double jeopardy." In their view, had the trial court sustained defense counsel's objection to Harris's testimony, the prosecution could have attempted to prove that P.M. was murdered for the common benefit of LHP another way. In this sense, the People appear to be arguing that it would be unfair not to allow the prosecution to retry the case because the prosecution reasonably relied on the trial court's ruling and believed it had offered sufficient evidence to satisfy its burden of proof.

Perhaps on a different record, the People's argument would be more persuasive. Here, the People wanted Padilla to testify about statements made by a witness with personal knowledge of the circumstances surrounding P.M.'s murder. Barnes's trial counsel objected. The court held an Evidence Code section 402 hearing to explore the admissibility of Padilla's testimony about the witness's statements. At that hearing, Padilla testified

36

about the substance of the witness's statement to him describing the murder. After hearing the testimony, the court and prosecutor engaged in the following exchange:

> "[The Court:] So his—corporal Padilla's relying and relating this general overview of the predicate offense, which he may probably, I'm suspecting you have a certified record of conviction. But to tell, oh, this is what happened, this is what this case is about, this conviction, this is what it's about. There was this fight earlier, this individual tries to get them to make it up, come out. It's retaliation for the shooting. And it's not a spontaneous statement when it's referred to as the first interview at the hospital. And the second interview occurs at the police, where really the most information is given. How is that not case-specific hearsay?

> "[Prosecutor]: After reading *Garcia*, your Honor, I believe it's clarified that it's case specific hearsay—"

The prosecutor subsequently argued that the witness's statements to Padilla were admissible as spontaneous statements under Evidence Code section 1240. The court disagreed.

The prosecutor did not give up. He filed a brief again arguing that the witness's statements to Padilla were admissible as spontaneous statements under Evidence Code section 1240. The court allowed the prosecutor to argue the point again but came to the same conclusion: The witness's statements were case-specific hearsay and not admissible as spontaneous statements.

At that point, the prosecutor was aware that if he wanted to get evidence of the circumstances surrounding the murder of P.M. admitted at trial, he had to take a different route. The substance of the subject witness's statements were case-specific hearsay and inadmissible. The court was adamant on that point.

The prosecutor's apparent solution to this evidentiary obstacle is equal parts surprising and puzzling. He simply asked another witness, one who

37

like Padilla lacked the requisite personal knowledge, to testify as to the circumstances of P.M.'s murder.  That witness was Harris.

The prosecutor asked Harris, based on his background, training, experience, and materials he reviewed, whether P.M.'s murder commonly benefited LHP.  Harris answered in the affirmative, adding that it benefitted the gang "[b]y taking down a rival."  The trial court sustained a defense objection to Harris's testimony, noting that Harris could not testify as to the details of the murder based on his review of police reports.  Therefore, the court struck Harris's testimony that Khan murdered P.M. to "take down a rival" but allowed Harris's naked opinion that the murder benefitted LHP to stand.

Now, at this juncture, the prosecutor had tried three times to have two witnesses testify as to the circumstances of P.M.'s murder by offering case-specific hearsay.  Three times the court had sustained the objection to such evidence.  Not deterred, the prosecutor once again asked Harris, based on his review of reports and talking to law enforcement, how P.M.'s murder benefitted LHP, to which Harris responded that the purpose of the murder was retaliation.  Not surprisingly, defense counsel objected that there was no evidence before the jury that P.M.'s murder was committed for retaliation and emphasized that Harris's testimony was inadmissible if he was relying on hearsay.  The prosecutor then responded, "There's no case-specific information submitted to the jury."  Therefore, the prosecutor represented to the trial court that Harris was not offering case-specific hearsay, like he previously tried to do, but had some other source of information (perhaps, personal knowledge) on which he could base his opinion.  The court overruled the objection, noting "It's opinion testimony."

38

Yet, what is lacking in the record is any suggestion whatsoever that Harris had personal knowledge that Khan murdered P.M. for retaliation. Nor is there any indication in the record that there was admissible evidence before the jury on which Harris could rely to form his opinion that Kahn murdered P.M. for retaliation.

Against this backdrop, we struggle to accept the People's framing of the issue before us as one of an evidentiary nature that would allow retrial on the gang offense and enhancements. At the Evidence Code section 402 hearing, the court clearly informed the prosecution *twice* that it would not be permitted to offer case-specific hearsay through Padilla. In response, the prosecutor all but flaunted the court's ruling by trying to offer the same prohibited evidence through Harris. Rebuffed by the court during his first attempt with Harris, the prosecutor again asked Harris to provide the inadmissible evidence but claimed it was not case-specific hearsay. The court then, as the People now concede, prejudicially erred in admitting that evidence based on the court's ruling that Harris was simply offering "opinion testimony." The court's ruling, in turn, appears to be based on the prosecution's explanation that Harris was not offering case-specific hearsay as part of his opinion.

Consequently, it borders on farcical for the People to now argue that the court's ruling somehow prevented the prosecutor from offering admissible evidence to establish the subject predicate act. The prosecutor was given ample opportunity to offer admissible evidence. The prosecutor knew the court was not going to admit case-specific hearsay. The prosecutor tried to get that evidence admitted through Harris anyway. When the court would not permit such an approach, the prosecutor represented that Harris was not offering case-specific hearsay, implying that Harris had some admissible

39

basis for his opinion. It is clear he did not. The prosecution had its opportunity to establish Khan murdered P.M. for the benefit of LHP and failed to provide sufficient evidence of that necessary fact. It cannot now benefit from the court's error in admitting the prosecution's evidence, the very evidence the prosecutor represented was proper opinion and did not constitute case-specific hearsay. In other words, the court's erroneous overruling of defense counsel's objection does not provide the prosecution with yet another opportunity to prove the required predicate act. It had its opportunity. It offered its best evidence. And it is undisputed that the evidence the prosecution offered lacked the necessary foundation. There was no basis offered regarding how Harris knew that Khan killed P.M. for retaliation. Hence, the evidence was insufficient as a matter of law. (See *Alexander L., supra*, 149 Cal.App.4th at p. 612.)

"Unlike a reversal for trial error, which 'does not constitute a decision to the effect that the government has failed to prove its case' [citation], a reversal based on evidentiary insufficiency 'means that the government's case was so lacking that it should not have been submitted to the jury. Since we necessarily afford absolute finality to a jury's verdict of acquittal—no matter how erroneous its decision—it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty.' " (*People v. Seel* (2004) 34 Cal.4th 535, 544; see *id*. at p. 550 [where appellate court found insufficient evidence of deliberation or premeditation in attempted murder, the double jeopardy clause precluded retrial of that allegation].) Further, double jeopardy principles preclude retrial when the evidence is insufficient, even if it does not preclude retrial when evidentiary errors are found. (*United States v. DiFrancesco* (1980) 449 U.S. 117, 131;

40

*Lockhart v. Nelson* (1988) 488 U.S. 33, 39; *Burks v. United States* (1978) 437 U.S. 1, 18; see *People v. Eroshevich* (2014) 60 Cal.4th 583, 591 ["the defendant may not be retried if the judgment is reversed because, as a matter of law, the evidence was insufficient to support a conviction"].)

The jury's verdict and findings regarding the gang offense and allegations must be reversed based on a lack of substantial evidence. The prosecution is not permitted to retry Barnes as to this offense or these enhancements.[11]

## DISPOSITION

The judgment is reversed, and the matter remanded to the superior court for further proceedings consistent with this opinion. The People may retry Barnes as to counts 1 through 9 only. The People may not retry Barnes as to count 10 or any of the gang related enhancements, even if those enhancements relate to counts 1 through 9.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

---

[11] Because we are reversing the judgment in its entirety, we do not need to reach Barnes's argument that the court prejudicially erred by failing to provide CALCRIM No. 332.

41